IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MICHAEL FOLEY, et al., : | |
| : | |
| Plaintiffs, : | |
| vs. : | CIVIL NO. 07-1002 |
| : | |
| NATIONAL NAVIGATION COMPANY, : | |
| : | |
| Defendant. : | |

**MEMORANDUM OPINION AND ORDER**

**RUFE, J.**                                                                                                                              **July 14, 2009**

Plaintiffs Michael Foley ("Foley") and Collette Foley ("Mrs. Foley") ( collectively "the Foleys)," residents of the Commonwealth of Pennsylvania, bring suit against Defendant National Navigation Company ("National Navigation"), a foreign company, located in Cairo, Egypt which qualifies as a "foreign state" under 28 U.S.C. § 1603.[1] Foley alleges that due to the carelessness and negligence of National Navigation he sustained serious injuries for which he seeks compensation for medical care and treatment, loss of earnings, benefits and earning capacity. Mrs. Foley claims loss of consortium, services, support, companionship and other losses she may suffer in the future as a result of National Navigation's alleged negligence and carelessness. Jointly, the Foleys claim losses of more than $100,000. All claims are governed by the 1972

---

[1] See Doc. No. 15 "Order Granting Defendant's Motion to Strike Plaintiff's Jury Demand." The Court found that Defendant is a foreign state since approximately 96% of its shareholders are companies owned by the government.

Amendments to the Longshore and Harbor Workers' Compensation Act ("LHWCA").[2] Before the Court is National Navigation's Motion for Summary Judgment[3] and the Foley's Response.[4] For the reasons that follow, the Court will grant National Navigation's Motion for Summary Judgment.

I.   FACTS AND PROCEDURAL HISTORY

A.   The Injury

On or about June 9, 2006, Foley was an employee of Kinder Morgan Terminals ("Kinder Morgan"), a stevedore company.[5] He was part of the basic workforce.[6]  He arrived for his shift at approximately 7 p.m. and participated in a nightly meeting where longshoremen received work assignments.[7] Although Foley does not remember the specific hatch number he was assigned to, Kinder Morgan's records indicate that it was "Hatch 2"[8] of the ship M.V. Wadi Alarish (the "Ship"), which is owned by National Navigation.[9]  His duties that evening included discharging

---

[2] 33 U.S.C. § 905(b).

[3] Doc. No. 24.

[4] Doc. No 25.

[5] For the purposes of this opinion, "stevedore" shall refer to the company hired to unload a vessel, in this case Kinder Morgan.  The term "longshoreman" will be used to describe the individuals hired by the stevedore to perform the unloading.  At the time of the incident in question Foley was acting as a longshoreman.  The law sees no distinction between the two terms and the Longshore and Harbor Compensation Act 33 U.S.C. § 905(b) applies to this action regardless of the specific terms used.  See Def. Mot. Summ. J. p. 2, n. 2.

[6] Compl. ¶ 7.

[7] Def. Mot. Summ. J. Ex. C, Deposition of Michael Foley, February 27, 2008 ("Foley Dep.") 22:19-24.

[8] See Def. Mot. Summ. J. Ex. O "Kinder Morgan Accident Report."

[9] Compl. ¶ 8.

steel slabs, a task which he had performed before.[10] Somewhere between approximately 8 p.m. and 8:30 p.m., after hooking up a slab for discharge, Foley lost his footing, "stepped on nothing," and fell from the top of the steel slabs to the floor, resulting in fractures of the face, skull, left elbow, left wrist, pelvic bone, right hip, right wrist, left shoulder, right knee and ankle, in addition to later vision problems.[11]  Neither the fact that Foley fell, nor the extent of his injuries is in dispute, and the facts are largely uncontested.  The legal controversy presented hinges primarily on a determination of which party had the legal responsibility to provide light to the longshoremen.

> B.     **The Chain of Command**

The crew members of the Ship employed by National Navigation had no control over the operations of the stevedore company Kinder Morgan.[12]  However, if the longshoremen employed by Kinder Morgan needed a change in the Ship's conditions, a specific chain of communication was in place to ensure that need was met.[13] If a longshoreman such as Foley had a concern about conditions in the hatch he would report it to the "lead man."[14] The lead man in Hatch 2 on the evening of the accident was Philip Blaine ("Blaine").  Once the lead man was aware of an issue, he was to report it to either a supervisor or "journeyman."  Blaine's supervisor that evening was

---

[10] Foley Dep. 25:14-18.

[11] Compl. ¶ 8.

[12] Def. Mot. Summ. J. Ex. N, Deposition of Richard Puchino, May 22. 2008 ("Puchino Dep.") 21:18-24; Ex. F,  Deposition of Philip Blaine, June 17, 2008 ("Blaine Dep.") 22:14-24.

[13] Blaine Dep. 22:14-24.

[14] Blaine Dep. 8:7-14.

Tom Langle ("Langle").[15] It then became the supervisor's responsibility to communicate with the Ships's crew or officers regarding the action needed to address the issue.[16] The "lead" supervisor employed by Kinder Morgan that evening was Bruce Kelly ("Kelly").[17] The only member of the Ship's crew directly identified or deposed with respect to this action is Hatem Arrif Hahmoud Edris Hayoub ("Hayoub"), who was the third officer of the ship.[18] Kinder Morgan had a Terminal Operations Supervisor to overlook stevedore activities throughout the dock, including operations on other ships. Peter Gardzinki ("Gardzinski") was the Terminal Operations Supervisor on June 9, 2006.[19]

**C.     The Chain of Communication About Lighting on June 9, 2006**

June 9, 2006 was a clear and dry late spring day.[20] According to the U.S. Naval Observatory, sunset took place at 8:28 p.m. and civil twilight ended at 9:01 p.m.[21] Longshoremen working in Hatch 2 with Foley included Howard Wildey ("Wildey"), Mark Miller ("Miller"), and Keith Williams ("Williams"), with Blaine acting as the "lead man."

Foley, Wildly, Miller, Williams and Blaine boarded the ship shortly after a 7 p.m. meeting regularly held at the beginning of each nightshift. Also around 7 p.m., Gardzinski

---

[15] Blaine Dep. 14-24. No deposition testimony from Langle has been provided by either party.

[16] Id.

[17] Def. Mot. Summ. J. Ex. M, Deposition of Bruce Kelly, April 16, 2008 ("Kelly Dep.") 12:13-17.

[18] Def. Mot. Summ. J. Ex. I, Deposition of Hatem Arrif Mahmoud Edris Hayoub, October 24, 2008 ("Hayoub Dep.") 9:14-16.

[19] Def. Mot. Summ. J. Ex. E, Deposition of Peter Gardzinski, May 29, 2008 ("Gardzinski Dep.") 14:21-24.

[20] Gardzinski Dep. 14:14-15.

[21] See Def. Mot. Summ. J. Ex. Q.

boarded the ship to "look at the two holds that we would be working that night, the stow of the cargo, make contact with the duty officer, okay, to make sure that there was lighting and preparations and to make sure the hatches were open."[22] It was still light out at the time, but Gardzinski was aware that preparations needed to be made to ensure that the longshoreman had appropriate lighting, although there was no set time when lighting was to be in place.[23] His impression was that the working conditions were safe.[24] Gardzinski made contact with the Ship's duty officer to discuss lighting needs, but did not know the name of the duty officer or make a record of the contact. He testified that the unnamed crew member was reluctant to provide four lights in the Hatch and only wanted to provide two.[25] After assessing the lighting situation and speaking with the duty officer, Gardzinski left the ship and returned to the terminal.

Meanwhile, Foley, Wildey, Miller, Williams and Blaine had begun their work for the evening, discharging steel slabs in Hatch 2. Foley alleges that when he started work at approximately 7:30 p.m. that "[i]t was dark, no lights" in the hatch.[26] Blaine testifies to the

---

[22] Gardinski Dep. 14:21-15:1.

[23] Gardzinski Dep. 17:16-24. "At 7:00 it's time to make preparations, okay, for lighting to be placed in the hold. It depends on the time of year, actually, sunset falls at different times during the course of the year, all right. At that time of year it's – it was still light out, okay, but nonetheless it's time to make preparations for lighting to be placed in, and for the duty officer to have a clear understanding as to exactly what the needs are."
    The fact that there is no precise time at which lights must be functioning was seconded by Kelly, lead supervisor that night. "One of the things with the night shift, especially that time of year, there is a big difference in lighting a hold from the time of year. Say for example, during the winter months when it's dark out at 5 o'clock in the evening, the holds are lit when you board the ship. So we typically have a person which our journeymen go on board the ship, and if the lights aren't on and in the hold, just start saying, come on, let's get some lights in the hatch." Kelly Dep. 11:15-16:2.

[24] Gardzinski Dep. 22:23-23:3.

[25] Gardzinsiki Dep. 15:13-19.

[26] Foley Dep. 33:12-17.

same.[27] Miller states that the lighting only became a problem as it got darker out, and Wildey also states that the lighting conditions changed for the worse after they started work.[28] All of the longshoremen working in Hatch 2 testify that they informed Blaine in his capacity as lead man that they needed more lighting and that he had passed on that information to his supervisor via radio more than once.[29] However, no one identified a specific time that any requests were made. Miller claims that the first call over the radio may have been made "half an hour, 45 minutes before [the accident], maybe an hour."[30]

Blaine testified that he made at least four requests to his supervisor, Langle, over the radio telling him "that the lighting was poor in our hatch and we needed lights."[31] He communicated with Langle through radio channel two, which means that any supervisor tuned to that channel would have heard the request.[32] Langle informed Blaine that he was going to "take care of it."[33] While there were no lights directly in Hatch 2, the longshoremen were working with the glow of one artificial light, which was hanging from a crane in the area. Blaine stated that, "[t]hey're not bright enough to work under.  They shouldn't – that is basically for the crane operator to see kind of our vests down there, but we shouldn't be just working under that light at

---

[27] Blaine Dep. 20:22-24.

[28] Def. Mot. Summ. J. Ex. H, Deposition of Mark Miller, April 17, 2008 ("Miller Dep.") 15:15-21; Ex. G, Deposition of Howard Wildey, June 11, 2008 ("Wildey Dep.") 16:7-13.

[29] See Foley Dep. 33:18-34:5; Miller Dep. 15:22-16:22; Wildey Dep. 16:13-17.

[30] Miller Dep. 17:2-10.

[31] Blaine Dep. 21:9-20.

[32] Blaine Dep. 33:9-13.

[33] Blaine Dep. 23:11-16.

all."[34] Blaine further testified that he considered it dangerous to continue working, and reported as much to his supervisor Lange, who responded that "they were going to get lighting, and continue to keep working."[35]

Kelly, who was the "lead," supervisor for Kinder Morgan that evening, though not the one Blaine reported to directly, also testified that there was one light near the hatch where Foley was working. He did not believe that the situation at the time of Foley's accident was dangerous enough to stop working, but moving toward that point. "It wasn't unsafe at the moment. It was progressing, you know, as you know it gets darker as the minutes go by. We had one light in the hold. The sky was still somewhat not bright, but, you know, it wasn't dark yet, so we felt we still had enough light to work under. But we were, I would say we were pretty much at the point because I had already told Pete, the supervisor, that if we don't get light soon we're going to have to stop discharge. And the accident happened."[36]

At some point before the accident Gardzinski had re-boarded the ship aware that lighting had been requested in Hatch 2. He insisted on speaking to the Ship's chief officer, who he claims refused to come to the deck. Instead, he was escorted to the chief officer's quarters.[37] Gardzinski stated that he told the chief officer that if four lights were not immediately placed in each of the holds that he would shut down the Ship and National Navigation would be charged back for

---

[34] Blaine Dep. 27:12-16.

[35] Blaine Dep. 27:23-28:14.

[36] Kelly Dep. 25:16-24.

[37] Gardzinski Dep. 23:7-20.

standby time.[38] He says that the chief officer then agreed to provide the lighting. As Gardzinski was leaving the chief officer's quarters a call came across his radio that there had been an accident.[39] Gardzinski returned to the deck and witnessed Foley, who he described as " a severely injured man," lifted out of Hatch 2 via a basket. [40] Subsequently, the Ship quickly provided all requested lighting.[41]

An internal Kinder Morgan investigation took place following the accident. The initial report by Michael Angelo ("Angelo"), Kinder Morgan's facility security officer, dated June 10, 2006, the day after the accident, states that it was unknown whether lack of lighting contributed to the accident.[42] Thomas Stafiniak, a Kinder Morgan Environmental Health and Safety Manager testified that he examined a Hatch similar to the one Foley had been working within days of the accident. At approximately 8 p.m., with all the lights turned off, he found that the work area was visible, that it was easy to see throughout the hatch, and that the gaps between the slabs of steel were visible.[43] Employees of Kinder Morgan testified that there was a possibility that Kinder Morgan could have provided its own lights, which were kept in the terminal area, but did not that evening.[44] Kinder Morgan now maintains its own lights to illuminate a work area instead of

---

[38] Gardzinski Dep. 24:1-9.

[39] Foley Dep. 24:14-18.

[40] Gardzinksi Dep. 47:7-16.

[41] Gardzinski Dep. 24:10-12.

[42] Def. Mot. Summ. J. Ex. O, "Environmental/Accident/Incident/Illness/ Near Miss Investigation Form."

[43] Def. Mot. Summ. J. Ex. P, Deposition of Thomas Stafiniak, August 11, 2008 ("Stafiniak Dep.") 26:10-24.

[44] Gardzinski Dep 25:20-26:7; Kelly Dep. 23:10-24:24.

relying merely on a ship's lighting if it feels there is a safety issue.[45]

National Navigation filed for summary judgment on the grounds that it did not breach any of the duties owed to a stevedore as governed by the LHWCA. Those duties include (1) the "turnover duty," which encompasses the "duty to warn;" (2) the "active participation duty," and (3) the active participation duty.  Additionally, National Navigation argues that Kinder Morgan was directly responsible for lighting conditions per OSHA regulations, and that Foley and Kinder Morgan were contributarily negligent.  In response to the Motion for Summary Judgment the Foleys argue that several issues of material fact exist as to whether National Navigation breached the "turnover duty" and the "duty to warn." The issues have been briefed and the Motion is ready for disposition.

**II   LEGAL STANDARD**

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."[46]  An issue of material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[47]  In examining motions, all inferences must be drawn in the light most favorable to the non-movants, and their allegations must be treated as true whenever they conflict with those of the movants and are supported by proper proofs.[48]  The Court will not, however, make any

---

[45] Def. Mot. Summ. J. Ex. L, Deposition of James D. Schine ("Schine Dep.") 20:21-24.

[46] Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

[47] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

[48] Kopec v. Tate, 361 F.3d 772, 775 (3d Cir. 2004).

credibility determinations or weigh the evidence presented.[49]

The party moving for summary judgment bears the initial burden of demonstrating that there are no genuine issues of material fact.[50] Once the movant has done so, the opposing party cannot rest on its pleadings.[51] To avoid summary judgment, the non-movant must come forward with probative evidence demonstrating the existence of genuine issues for trial.[52] The nonmovant therefore must raise "more than a mere existence of a scintilla of evidence in its favor" on elements for which it bears the burden of production.[53] An inference based upon speculation or conjecture will not create a material fact.[54]

## III. DISCUSSION

The statutory obligations of a ship owner to a stevedore are governed by the LHWCA[55] and include three specific duties outlined by the Supreme Court in Scindia Steam Navigation Ltd. v. De Los Santos, 451 U.S. 156 (1981). Those duties are: (1) the "turnover" duty which includes a corollary "duty to warn," (2) the "duty to intervene" and (3) the "active participation duty."

The Supreme Court is explicit in Scindia that the duties imposed on a ship owner in the LHWC do not relieve a stevedore of its obligations to provide its workers with a safe work

---

[49] Goodman v. Pa. Tpk. Comm'n, 293 F.3d 655, 665 (3d Cir. 2002) (quoting Reeves v. Sanderson Plumbing Prods., 560 U.S. 133, 150 (2000)).

[50] Fed. R. Civ. P. 56(c).

[51] Celotex, 477 U.S. at 324.

[52] Id. at 323-24.

[53] Anderson, 477 U.S. at 252.

[54] Robertson v. Allied Signal, Inc., 914 F.2d 360, 382 n.12 (3d Cir. 1990).

[55] 33 U.S.C. § 905(b).

environment under OSHA regulations.[56] Specifically, the stevedore's obligation to provide proper illumination is outlined in 29 C.F.R. § 1918.92 which states, "Walking, working, and climbing areas shall be illuminated. Unless conditions described in the regulations of the U.S. Coast Guard [citation omitted] exist for specific operations, illumination for cargo transfer operations shall be of a minimum light intensity of five foot-candles (54 lux). Where work tasks require more light to be performed safely, supplemental lighting shall be used."[57] The same regulations also state that, "Employees shall not be permitted to enter dark holds, compartments, decks or other spaces without a flashlight or other portable light."[58] The Court must evaluate whether there is any question of material fact regarding whether National Navigation breached any of its three duties to Kinder Morgan under the LWHCA or whether the conditions that allegedly led to Foley's accident were those in which Kinder Morgan had an obligation to provide a safe working environment as dictated by OSHA.

### A. The "Turnover Duty"

The Third Circuit has echoed the Supreme Court's ruling in Scindia in recognizing a ship owner's "turnover duty" and its corollary "duty to warn":

---

[56] See 29 C.F.R. § 1918 et seq. See also Scindia Steam Navigation Ltd, 451 U.S. 156 U.S. at 170. "33 U.S.C. § 941, requires the stevedore, the longshoremen's employer, to provide a 'reasonably safe' place to work and to take such safeguards with respect to equipment and working conditions as the Secretary of Labor may determine to be necessary to avoid injury to longshoremen. The ship is not the common employer of the longshoremen and owes no such statutory duty to them. Furthermore, as our cases indicate, the stevedore normally warrants to discharge his duties in a workmanlike manner; and although the 1972 Amendments relieved the stevedore of his duty to indemnify the shipowner for damages paid to longshoremen for injuries caused by the stevedore's breach of warranty, they did not otherwise disturb the contractual undertaking of the stevedore nor the rightful expectation of the vessel that the stevedore would perform his task properly without supervision by the ship.

[57] 29 C.F.R. § 1918.92(a).

[58] 29 C.F.R. § 1918.92(e).

> "This [turnover]duty extends at least to exercising ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property, and to warning the stevedore of any hazards on the ship or with respect to its equipment that are known to the vessel or should be known to it in the exercise of reasonable care, that would likely be encountered by the stevedore in the course of his cargo operations and that are not known to the stevedore and would not be obvious to or anticipated by him if reasonably competent in the performance of his work . . .The shipowner thus has a duty with respect to the condition of the ship's gear, equipment, tools, and work space to be used in the stevedoring operations; and if he fails at least to warn the stevedore of hidden danger which would have been known to him in the exercise of reasonable care, he has breached his duty and is liable if his negligence causes injury to a longshoreman."[59]

The turnover duty specifically involves a shipowner's obligation to ensure that its ship conditions are safe for the stevedore *before* the stevedore's operations begin.[60] Based on the evidence before it, the Court cannot determine any issue of material fact as to whether National Navigation did not properly inspect the ship before Kinder Morgan began operations. Nor can it discern any evidence that the longshoremen *began* work in conditions that were unsafe or had hidden hazards. Several people in Kinder Morgan's chain of command, including supervisors Gardzinski and Kelly, testified that the lighting conditions were safe when the ship was turned over to them and that they were aware that the lighting situation would be changing as the sun set.[61] The supervisors deposed made clear that when

---

[59] Kirsch, 971 F.2d at 1029 (citing Scindia Steam Navigation Ltd, 451 U.S. 156 U.S. at 166-167).

[60] Kirsh, 971 F.2d at 1029. "The major distinction between the turnover duty and the duty to intervene is that the turnover duty covers the shipowner's conduct before cargo operations have begun, while the duty to intervene addresses conduct after turnover. Scindia holds that the shipowner has no continuing duty to inspect or supervise cargo operations by the stevedore after turnover."

[61] Gardzinski Dep. 22:23-23:3; Kelly Dep. 25:16-24.


the nightshift began there was still ample daylight.[62] There is no argument from any employee of Kinder Morgan that the Ship's lighting conditions were unsafe at the time it was "turned over" for stevedore operations. Moreover, the available evidence shows that there is no question of material fact as to whether National Navigation breached the corollary "duty to warn." There were "no hazards on the ship or with respect to its equipment that [were] known to the vessel or should [have been] known to it in the exercise of reasonable care, that would likely be encountered by the stevedore in the course of his cargo operations and that [were] not known to the stevedore and would not be obvious to or anticipated by him if reasonably competent in the performance of his work."[63] Those in charge of operations at Kinder Morgan repeatedly testified that they were well aware of the changing lighting situation both that night and as a general concern in the course of operations for the nightshift at that time of year. It was not an unknown or unanticipated hazard and no breach of the duty to warn of unobvious hazards is indicated.

However, the Third Circuit has described a two-pronged exception to the general rule that obvious hazards are a bar to shipowner liability when a ship is turned over to a stevedore. The ship will be liable if either (1) avoiding the hazard would be impractical for the longshoreman, or (2) the Ship should have known that the longshoremen would confront that hazard.[64] There is no question that National Navigation had constructive knowledge that the longshoremen would confront diminishing lighting both because of their general

---

[62] Id.

[63] Kirsch, 971 F.2d at 1029.

[64] Hill v. Reederei F. Laeisz G.M.B.H., 435 F.3d 404, 409 (3d Cir. 2006).

knowledge of sunset times and because of Kinder Morgan's communication with the Ship's crew about the need for lighting. Yet, "The 'practical measures' duty has nothing to do with the shipowner's knowledge, or with the frequency of occurrence of the hazard, but simply with 'whether, under all the circumstances, safer alternatives were impractical.'"[65] Therefore, the question is whether avoiding the hazard was impractical for the longshoremen.

Kinder Morgan employees testified that it was customary to halt operations in the event of an encountered hazard.[66] Although the lack of lighting was becoming increasingly obvious, supervisors Gardzinski and Kelly were both in a position to halt work if they deemed the circumstances unsafe. But neither one chose to stop the longshoremen's work and both testified that conditions remained safe up until the very moment of the accident.[67]

"A duty will attach when the longshoreman's 'only alternatives would be to leave his job or face trouble for delaying the work.'"[68] Several employees testified that Kinder Morgan kept additional lighting in the terminal and chose not to use that option on the evening of the accident demonstrating that they had other lighting sources and chose not to implement

---

[65] Hill, 435 F.3d at 410.

[66] Angelo Dep. 14:5-24.

[67] Gardzinski Dep. 22:23-23:3; Kelly Dep. 25:16-24.

[68] Id.

them.[69] Moreover, no evidence has been presented that the longshoremen would have faced "trouble for delaying work" if discharge operations had ceased for a brief period.

The duty to provide adequate lighting after stevedore operations begin falls with the stevedore according to OSHA regulations. A court of this district faced a situation factually similar to the one at bar in Matthews v. Pan Ocean Shipping Co., 1992 U.S. Dist. Lexis 3593 (E.D.Pa. 1992). It involved a longshoreman who began work for a stevedore in the evening. The ship's crew had provided some lighting to the work area. While the longshoreman was in a poorly illuminated section of the work space he stepped into a hole in between the crates of cargo and suffered serious injuries. The court found that "Even accepting as true the plaintiff's deposition testimony that it was dark and shadowy in the corner where he fell ... that evidence cannot support a finding that the shipowner was negligent because it was the duty of the stevedore, not the shipowner to provide adequate lighting."[70] The court went on to cite statutory duty of the stevedore as directed by 29 C.F.R. 1918.92 which states that, "all walking and working areas shall be adequately illuminated."

The record evidence presented fails to create a dispute of material fact regarding whether National Navigation breached its "turnover duty" or "duty to warn," under the LHWCA. Kinder Morgan was legally obligated to provide lighting under OSHA regulations.

---

[69] Gardzinski Dep. 26:2-7. "Q: It [lighting] could have been provided by Kinder Morgan? A: Yes. Q: Did they provide it that evening? A: Negative." Puchino Dep. 20:19-21:8. "Q: At the time of Mr. Foley's accident if additional lighting had been needed in the hatch, was it available, did Kinder Morgan have it in some form. A: I guess in some form we could have rigged something up. I don't know. Q: Did Kinder Morgan have light towers I think that have been referred to? A: Yes. We have light towers, portable light towers. Q: And what are they? A: Just a little trailer, generator with lights that go up on a boom. Q: And were they – Kinder Morgan had them at the time of M. Foley's accident? A: Yes."

[70] Matthews, 1992 U.S. Dist. LEXIS 3593 *4.

B.     **Active Participation Duty**

Although Plaintiff does not argue that the "active participation duty" was breached, National Navigation addresses it in its Motion for Summary Judgment. Under the LHWCA a shipowner may be liable if it, "actively involves itself in the cargo operations and negligently injures a longshoreman, or if it fails to exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation."[71] The Third Circuit has directly addressed what triggers the "active operations duty." "[T]he vessel must have substantially controlled or been in charge of (i) the area in which the hazard existed, (ii) the instrumentality which caused the injury, or (iii) the specific activities the stevedore undertook."[72]

Employees of Kinder Morgan consistently maintained that they were in charge of the operations in Hatch 2 and that no member of the Ship's crew interfered or had any say over their activities.[73] The testimony of the various longshoremen and supervisors at Kinder Morgan demonstrates that the specific activities of the stevedore, that is the steel slab discharge, that evening was within the full control of Kinder Morgan. The Court finds that the "active operations duty" was not triggered and therefore no issue of material fact exists regarding whether National Navigation breached it.

---

[71] Scindia, 452 U.S. at 167.

[72] Davis v. Portline Transportes Maritime Internacional, 16 F.3d 532, 540 (3d Cir. 1994).

[73] Puchino Dep. 21:18-24.

### C.    Duty to Intervene

"'The duty to intervene, in the event the vessel has no knowledge of the hazardous condition, is limited: Absent contract provision, positive law, or custom to the contrary, a vessel has no general duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop within the confines of the cargo operations that are assigned to the stevedore."[74]

Toward showing that National Navigation breached this duty, the only evidence put forth by Foley is his contention that it was National Navigation's sole responsibility to provide light for Kinder Morgan's operations. He cites no contract provision, positive law, or specific custom between stevedores and shipowners that made it National Navigation's sole responsibility to provide lighting.  Foley has established that National Navigation generally provided light in the hatches once it was dark, but the record and the law also makes clear that Kinder Morgan had the capability and legal duty to provide that light themselves.[75]

 "Positive law, acts against Foley since OSHA regulations specifically state that it is part of the stevedore's obligations to its workers to provide adequate lighting.[76] The Court finds no material issue of fact as to whether any contract, positive law or custom went

---

[74] Howlett v. Birkdale Shipping Co., 512 U.S. 92, 100-101 (1994).

[75] Schine Dep. 20:21-24.

[76] See 29 C.F.R. § 1918.92(e).

unfulfilled by National Navigation and therefore finds no breach of the duty to intervene under the LHWCA.

## IV.  Conclusion

The Court finds no issue of material fact as to whether National Navigation failed to fulfill any of the duties owed to a stevedore under the LHWCA. Providing adequate lighting was the legal responsibility of the stevedore, Kinder Morgan, according to OSHA regulations.  The Court will grant National Navigation's Motion for Summary Judgment. An appropriate order follows.

unfulfilled by National Navigation and therefore finds no breach of the duty to intervene under the LHWCA.

## IV.  Conclusion

The Court finds no issue of material fact as to whether National Navigation failed to fulfill any of the duties owed to a stevedore under the LHWCA. Providing adequate lighting was the legal responsibility of the stevedore, Kinder Morgan, according to OSHA regulations.  The Court will grant National Navigation's Motion for Summary Judgment. An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| MICHAEL FOLEY, et al., : | |
| : | |
| Plaintiffs, : | |
| vs. : | CIVIL NO. 07-1002 |
| : | |
| NATIONAL NAVIGATION COMPANY, : | |
| : | |
| Defendants. : | |

**ORDER**

**AND NOW**, this 14th day of July, 2009, upon consideration of Defendant's Motion for Summary Judgment [Doc. No. 24] and Plaintiffs' Reply [Doc. No. 25] it is hereby

**ORDERED** that Defendant's Motion is **GRANTED**.  All claims against Defendant arising under the Longshore and Harbor Workers' Compensation Act are **DISMISSED**.

The Clerk of Court is directed to **CLOSE** this case.

**BY THE COURT**:

s/Cynthia M. Rufe

_____

CYNTHIA M. RUFE, J.